# No. 14-826(L)

### No. 14-832(CON)

## In the United States Court of Appeals for the Second Circuit

_____

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

V.

STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,
DONZIGER & ASSOCIATES, PLLC, HUGO GERARDO CAMACHO NARANJO,
JAVIER PIAGUAJE PAYAGUAJE,

*Defendants-Appellants,*

(*caption continues on inside cover*)

_____

On Appeal from the United States District Court for the
Southern District of New York (The Honorable Lewis A. Kaplan)
_____

**REPLY BRIEF FOR DEFENDANTS-APPELLANTS STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN DONZIGER, AND DONZIGER &
ASSOCIATES PLLC**
_____

JUSTIN MARCEAU
JOHN CAMPBELL
University of Denver
Sturm College of Law
2255 E. Evans Ave.
Denver, CO 80208
(303) 871-6000

DEEPAK GUPTA
GREGORY A. BECK
JONATHAN E. TAYLOR
Gupta Beck PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

*Counsel for Defendants-Appellants Steven Donziger,
The Law Offices of Steven Donziger, and Donziger & Associates PLLC*

November 25, 2014

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

    *Defendants-Counter-Claimants*,

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TRANGUIL GREFA, ROSA TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, JOSE MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ, LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL CORDOVA HUANCA, ELIA ROBERTO PIYAHUA PAYAHUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE, DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJ PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE, EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILFRIDO PIAGUA PAYAGUAJE, ANGEL JUSTINO PIAGUAG LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI, YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA, CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA ENOMENGA, CAHUIYA OMACA, MIMA YETI,

    *Defendants*,

ANDREW WOODS, LAURA J. GARR, H5,

    *Respondents.*

# TABLE OF CONTENTS

Table of Authorities ............................................................................ iii

Introduction ........................................................................................ 1

Argument ............................................................................................ 5

    I.   Because the district court lacked subject-matter jurisdiction, this Court should reverse and vacate the factual findings. ............................ 5

        A.   Chevron has not shown that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court. ................................................................ 8

        B.   Chevron has not proved that its requested relief will likely redress an actual or imminent injury. ......................................... 12

            1.   Unrelated arbitral award owed by Ecuador. .................. 12

            2.   Ecuadorian trademarks of indirect subsidiaries. ............. 15

            3.   Costs of defending against enforcement actions. ............ 17

        C.   It is Chevron's burden to show that it had standing to seek its requested relief, not the defendants' burden to establish mootness. ................................................................... 20

        D.   Chevron does not deny that if the district court lacked jurisdiction, this Court should vacate its findings in their entirety. ...................................................................... 23

    II.   Neither state nor federal law authorizes Chevron's preemptive collateral attack on the Ecuadorian judgment. ......................................... 25

        A.   New York law does not authorize preemptive collateral attacks on foreign money judgments. ......................................... 25

        B.   RICO does not provide a vehicle for preemptive collateral attacks on foreign court judgments. .......................... 31

    III.   Chevron is judicially estopped from making a wholesale attack on the integrity of the Ecuadorian judicial system and the evidence for that attack is inadequate in any event. ............................................... 35

i

IV.  Chevron has established neither a cause of action under RICO
nor an entitlement to equitable relief. ....................................................40

    A.  Chevron has not met RICO's statutory prerequisites for a
private right of action.....................................................................40

        1.  RICO Injury................................................................................40

        2.  RICO Causation. ........................................................................43

    B.  RICO does not authorize a private cause of action solely
for equitable relief. ........................................................................45

    C.  As the majority of courts have held, equitable relief is *never*
available to private parties under RICO. ...................................49

    D.  Even if equitable relief were available as a general matter,
it is unwarranted here. ..................................................................54

        1.  Chevron has several adequate remedies at law. .............54

        2.  Chevron has not shown irreparable injury.....................55

        3.  The constructive trust was unwarranted. .......................57

V.  In the event of a remand, this case should be reassigned to a
different district judge. ...........................................................................58

Conclusion................................................................................................ 60

# TABLE OF AUTHORITIES

## Cases

*Agency Holding Corp. v. Malley-Duff & Assoc.*,
  483 U.S. 143 (1987)..................................................................52

*Aguinda v. Texaco, Inc.*,
  142 F. Supp. 2d 534 (S.D.N.Y. 2001) ........................................ 12, 38

*Am. Medical Association v. United Healthcare Corp.*,
  588 F. Supp. 2d 432 (S.D.N.Y. 2008) ...............................................49

*Amusement Industry, Inc. v. Stern*,
  786 F. Supp. 2d 758 (S.D.N.Y. 2011) ..............................................57

*Anza v. Ideal Steel Corp.*,
  547 U.S. 451 (2006)..................................................................45

*ASARCO Inc. v. Kadish*,
  490 U.S. 605 (1989)..................................................................14

*Basic v. Fitzroy Engineering, Ltd.*,
  949 F. Supp. 1333 (N.D. Ill. 1996),
  *aff'd*, 132 F.3d 36 (7th Cir. 1997) .........................................8

*Bixler v. Foster*,
  594 F.3d 751 (10th Cir. 2010)....................................................41

*Chafin v. Chafin*,
  133 S. Ct. 1017 (2013)..............................................................21

*Chase Manhattan Bank v. Hoffman*,
  665 F. Supp. 73 (D. Mass. 1987).................................................26

*Chevron Corp. v. Naranjo*,
  667 F.3d 232 (2d Cir. 2012) ................................................*passim*

*Chevron Corp. v. Republic of Ecuador*,
  949 F. Supp. 2d 57 (D.D.C. 2013),
  *appeal docketed*, No. 13-7103 (D.C. Cir.) ........................... 13, 42

*Clapper v. Amnesty International.*,
  133 S. Ct. 1138 (2013) ................................................................. *passim*

*Comer v. Cisneros*,
  37 F.3d 775 (2d Cir. 1994) ........................................................... 23

*Cover v. Schwartz*,
  133 F.2d 541 (2d Cir. 1942) .......................................................... 19

*Cullen v. United States*,
  194 F.3d 401 (2d Cir. 1999) .......................................................... 59

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ......................................... 5, 12, 15

*DeMent v. Abbott Capital Corp.*,
  589 F. Supp. 1378 (N.D. Ill. 1984) ............................................... 51, 52

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) .......................................................... 40

*Ellerman Lines, Ltd. v. Read*, [1928] 2 K. B. 144 ........................................ 29

*Executive Benefits Insurance Agency v. Arkison*,
  134 S. Ct. 2165 (2014) ................................................................ 11

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994) ........................................................... 42

*Franklin v. Gwinnett County Public Schools*,
  503 U.S. 60 (1992) .................................................................... 46

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................... 21

*Grand Light & Supply Co. v. Honeywell, Inc.*,
  771 F.2d 672 (2d Cir. 1985) .......................................................... 30

*Great-West Life & Annuity Insurance Co. v. Knudson*,
  534 U.S. 204 (2002) ................................................................... 58

*Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*,
  512 F.3d 742 (5th Cir. 2008) ......................................................... 33

iv

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC,*
  347 F. App'x 711 (2d Cir. 2009) ......................................................41

*Harris v. Interstate Training Serv.,*
  140 N.Y.S.2d 8 (Sup. Ct. 1955) ......................................................29

*Heldman on behalf of T.H. v. Sobol,*
  962 F.2d 148 (2d Cir. 1992) ................................................. 15, 17

*Hemi Group, LLC v. City of New York,*
  559 U.S. 1 (2010) ..............................................................................43

*High Adventure Ministries, Inc. v. C.I.R.,*
  726 F.2d 555 (9th Cir. 1984) ...........................................................57

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,*
  134 S. Ct. 1744 (2014) .....................................................................36

*Hispanics for Fair & Equitable Reapportionment v. Griffin,*
  95 F.2d 24 (2d Cir. 1992) ................................................................59

*Holmes v. Securities Investor Protection Corp.,*
  503 U.S. 258 (1992) ..........................................................................51

*In re Merrill Lynch Ltd. P'ships Litig.,*
  154 F.3d 56 (2d Cir. 1998) ..............................................................42

*Island Territory of Curacao v. Solitron Devices,*
  489 F.2d 1313 (2d Cir. 1973) ..........................................................26

*Kamilewicz v. Bank of Boston Corp.,*
  92 F.3d 506 (7th Cir. 1996) .............................................................32

*Kimm v. Chang Hoon Lee & Champ, Inc.,*
  196 F. App'x 14 (2d Cir. 2006) ......................................................43

*Knight v. Mooring Capital Fund, LLC,*
  749 F.3d 1180 (10th Cir. 2014) ......................................................31

*Lia v. Saporito,*
  541 F. App'x 71 (2d Cir. 2013) ......................................................35

*Ligon v. City of New York,*
    736 F.3d 118 (2d Cir. 2013) ........................................................58

*Lorillard Tobacco Co. v. Chester, Willcox & Saxbe,*
    546 F.3d 752 (6th Cir. 2008) .....................................................36

*Los Angeles v. Davis,*
    440 U.S. 625 (1979) ...................................................................20

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...........................................................*passim*

*Mackler Prods., Inc. v. Cohen,*
    225 F.3d 136 (2d Cir. 2000) ................................................. 58, 59

*Maio v. Aetna, Inc.,*
    221 F.3d 472 (3d Cir. 2000) .....................................................40

*Manson v. Stacescu,*
    11 F.3d 1127 (2d Cir. 1993) .....................................................41

*Massachusetts v. E.P.A.,* 549 U.S. 497 (2007) ................................19

*McLaughlin v. Am. Tobacco Co.,*
    522 F.3d 215 (2d Cir. 2008) .....................................................40

*Mei Yun Chen v. Mei Wan Kao,*
    97 A.D.3d 730 (N.Y. App. Div. 2012) ....................................57

*Minnesota v. Northern Securities Company,*
    194 U.S. 48 (1904) .....................................................................51

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ...................................................................54

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ...................................................................54

*Morgan Drexen, Inc. v. Consumer Financial Protection Bureau,*
    979 F. Supp. 2d 104 (D.D.C. 2013) .........................................56

*Motorola Credit Corp. v. Uzan*,
    202 F. Supp. 2d 239 (S.D.N.Y. 2002),
    *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003) ..................................... 47, 48, 53

*Motorola Credit Corp. v. Uzan*,
    322 F.3d 130 (2d Cir. 2003) ...................................................................................40

*National Organization for Women, Inc. v. Scheidler*,
    267 F.3d 687 (7th Cir. 2001)
    *rev'd on other grounds*, 537 U.S. 393 (2003)................................................. 46, 48, 50

*New Hampshire v. Maine*,
    532 U.S. 742 (2001).................................................................................................37

*Newman-Green, Inc. v. Alfonzo-Larrain*,
    490 U.S. 826 (1989).................................................................................................21

*Oscar v. University Students Co-operative Association*,
    965 F.2d 783 (9th Cir. 1992)..................................................................................40

*Overseas Development Bank in Liquidation v. Nothmann*,
    480 N.Y.S.2d 735 (N.Y. App. Div. 1984) ...........................................................29

*Paine Lumber Co. v. Neal*,
    244 U.S. 459 (1917).................................................................................................52

*Pentz v. Kuppinger*,
    107 Cal. Rptr. 540 (Cal. Ct. App. 1973)..............................................................28

*Petroleum Enhancer, LLC v. Woodward*,
    690 F.3d 757 (6th Cir. 2012)..................................................................................41

*Phoenix Mutual Life Insurance Co. v. Bailey*,
    80 U.S. 616 (1871)...................................................................................................55

*Raytheon Co. v. Ashborn Agencies, Ltd.*,
    372 F.3d 451 (D.C. Cir. 2004) ..............................................................................18

*Reisman v. Caplin*,
    375 U.S. 440 (1964).................................................................................................55

*Religious Tech. Ctr. v. Wollersheim*,
    796 F.2d 1076 (9th Cir. 1986)...............................................................................53

*Renegotiation Board v. Bannercraft Clothing Co.*,
    415 U.S. 1 (1974)..............................................................................56

*Republic of Ecuador v. Chevron Corp.*,
    638 F.3d 384 (2d Cir. 2011) ....................................................... 36, 37

*Salazar v. Buono*,
    559 U.S. 700 (2010)..........................................................................22

*Sedima, S.P.R.L. v. Imrex Co. Inc.*,
    741 F.2d 482 (2d Cir. 1984),
    *rev'd on other grounds*, 473 U.S. 479 (1985) ..............................53

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985).................................................................. 51, 52

*Solomon v. Vilsack*,
    628 F.3d 555 (D.C. Cir. 2010) ........................................................36

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004)..........................................................................34

*State of Georgia v. City of Chattanooga*,
    264 U.S. 472 (1924)..........................................................................55

*Steel Co. v. Citizens for a Better Environment*,
    523 U.S. 83 (1998)........................................................................5, 23

*Talenti v. Clinton*,
    102 F.3d 573 (D.C. Cir. 1996) ........................................................15

*Tamimi v. Tamimi*,
    38 A.D.2d 197 (2d Dep't 1972).......................................................28

*Trane Co. v. O'Connor Securities*,
    718 F.2d 26 (2d Cir. 1983) ..............................................................53

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010) ............................................................43

*United States v. Khan*,
    129 F.3d 114 (2d Cir. 1997) ............................................................54

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006) ...........................................................60

*United States v. Robin*,
    553 F.2d 8 (2d Cir. 1977) .............................................................60

*United States v. Simon*,
    393 F.2d 90 (2d Cir. 1968) ...........................................................59

*University of Texas Southwestern Medical Center v. Nassar*,
    133 S. Ct. 2517 (2013) .................................................................43

*US Ecology, Inc. v. U.S. Department of Interior*,
    231 F.3d 20 (D.C. Cir. 2000) .........................................................15

*Uzdavines v. Weeks Marine, Inc.*,
    418 F.3d 138 (2d Cir. 2005) ..........................................................36

*Venizelos v. Venizelos*,
    30 A.D.2d 856 (2d Dep't 1968) ......................................................28

*Woodling v. Garrett Corp.*,
    813 F.2d 543 (2d Cir. 1987) ..........................................................28

## Legislative Materials

15 U.S.C. § 4 .....................................................................................51

18 U.S.C. § 1964(b) ............................................................................50

18 U.S.C. § 1964(c) ......................................................................*passim*

116 Cong. Rec. 27,739 (1970) ............................................................52

116 Cong. Rec. 35,227 (1970) ............................................................52

*Código Orgánico de Planificatión y Finanzas Públicas*, art. 170 (Ecuador
    2010) ..................................................................................... 13, 14

H.R. Rep. No. 91-1549 (1970) ............................................................51

S. 13, 93d Cong. (1973) .....................................................................53

S. 16, 92d Cong. (1972) .....................................................................53

ix

## Books and Articles

Charles Wright & Arthur Miller, *Fed. Prac. & Proc.* (3d ed. 2014) ................... 10, 55

*Injunctions-Foreign Judgment-Enforcement Abroad Restrained*, 38 Yale L.J. 261 (1928) ..................................................................................................29

Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* (2014) .................................48

Mia Levi, *Inconsistent Application: Enforcing International Arbitral Awards in National Courts*, 27 N.Y. Int'l L. Rev. 47 (2014) ....................................................29

*Restatement (Third) of Restitution and Unjust Enrichment* (2011)......................................57

William M. Fletcher, et al., *Fletcher Cyclopedia of the Law of Corporations* (2010)..................................................................................................41

# INTRODUCTION

Chevron asks this Court to do the very thing it refused to do in *Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 (2d Cir. 2012)—create new "causes of action by which disappointed litigants in foreign cases" can preemptively attack judgments anywhere on the globe. But, in nearly two hundred pages of briefing, Chevron makes virtually no effort to show that the relief it seeks would redress any injuries— a requirement to get in the courthouse door.

Instead, Chevron openly admits (at 92 n.19) that what it really wants is a "freestanding determination" of the facts for use abroad. But our Constitution does not empower federal courts to author amicus briefs to foreign courts. "If such an advisory opinion were available, any losing party in litigation anywhere in the world" could "litigate the validity of [a] foreign judgment in this jurisdiction." *Id*. The Second Circuit would be transformed from a court with a limited charter into a worldwide fact-finding commission, a body from which losing parties could seek to extract findings, based on handsomely paid witnesses, for use on some distant shore.

When it comes to causation—yet another building block for any case in federal court—Chevron puts its head in the sand. Chevron refuses to accept the Ecuadorian Supreme Court's decision concluding that the court of appeals correctly engaged in de novo review of the facts and produced a substitute

judgment, such that "the court decision sought to be annulled here is the one rendered by the court of appeals, and not the one issued by [the] trial court, something which [Chevron] has confused." A-3605, A-3548. Chevron, to put it plainly, has been aiming at the wrong target.

Taken together, all this means that Chevron lacks standing and the district court lacked jurisdiction. And it means that the fact findings must be vacated—a consequence Chevron doesn't deny. Anything less would reward Chevron for using its bottomless war chest to brand Steven Donziger a criminal and Ecuador an international pariah, all on the flimsiest of evidence.

On the merits, Chevron's claims lack a basis in RICO or New York law. Because "a far better remedy is available" via enforcement proceedings, such claims inject federal courts into foreign relations unnecessarily. *Naranjo*, 667 F.3d at 246. And Chevron offers no sensible limiting principle to prevent hordes of global litigants from beating a path to the Second Circuit's door. Finally, Chevron's no-damages RICO theory—which lets private parties bring quasi-criminal cases without a jury—has no statutory basis.

For the Court's convenience, the following diagrams illustrate the decision trees in this appeal, and the burden that Chevron faces on its state and federal claims. To prevail, Chevron must be able to answer "Yes" to *every* question. We prevail, by contrast, if any one of the answers is "No."

# Common Law Claim: Chevron's Burden



# RICO Claim: Chevron's Burden



## ARGUMENT

**I.** **Because the district court lacked subject-matter jurisdiction, this Court should reverse and vacate the factual findings.**

Before this Court may consider anything else, it must first answer a single, fundamental question: Has Chevron established that its requested relief is likely to *redress* a legally cognizable injury *caused* by the defendants' alleged wrongdoing—in other words, that it has standing to sue?

This question, though basic, is as important as any confronting a federal court, for it goes to the very "nature and limits of the judicial power of the United States," which are "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). It is so foundational, in fact, that the Supreme Court "presume[s] that federal courts lack jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). If the plaintiff cannot overcome this presumption—if it cannot carry its burden of establishing standing throughout "the successive stages of the litigation," including "at the trial stage," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)—then the "dispute is not a proper case or controversy" and the court has "no business deciding it." *DaimlerChrysler*, 547 U.S. at 341.

Has Chevron carried its burden here? That is the question. And yet, for all of its massive filings, Chevron makes virtually no attempt to prove an actual or imminent injury caused by the alleged wrongdoing that its requested relief will

likely redress. The reason Chevron resists engaging the question is that no such injury exists. Although Chevron originally tried to ground its standing in nine different theories of injury, *see* S.D.N.Y.-Dkt. 1861, that list has now shrunk to just three:

(1)   the "attachment" of an arbitral award Chevron previously obtained against the Republic of Ecuador in a separate matter, "to the extent that the award otherwise would have been enforceable in Ecuador," SPA-326;

(2)   the "attachment," two years ago, of dormant Ecuadorian trademarks held by Chevron's "indirect subsidiaries," SA721; and

(3)   "legal fees to defend current and future enforcement proceedings," Chevron Br. 71, which Chevron's relief does not even purport to prevent.

Chevron argues that these injuries, moreover, were all caused by the alleged improprieties at the trial level in Ecuador—not Chevron's own liability there (which it chose never to contest here) and not the substitute judgment of the three-judge intermediate court (which Ecuador's Supreme Court has held supplants the trial court's judgment because a proper de novo review occurred, A-3545-48).

It is worth pausing to consider how truly strained these arguments are. What gives a U.S. court jurisdiction over this case, apparently, is the "attachment" in

Ecuador of dormant trademarks "relating to industrial lubricants in Ecuador only," which were owned by "a subsidiary held through another subsidiary" of Chevron, SA3693-96, as well as some unrelated arbitral award that Chevron has not sought to enforce in Ecuador and for which the sovereign Republic of Ecuador has not appropriated any funds. These theories of injury and redressability are so convoluted that it is no wonder Chevron says almost nothing about them. One even gets the sense that Chevron persists with its third asserted injury—which plainly isn't redressed by its requested relief—only to help convey the impression that there is some real, cognizable injury for the courts to remedy.

But, in the end, Chevron all but admits that it is not asking this Court to resolve any concrete case or controversy. What it really wants out of this proceeding—*all* it wants out of this proceeding—is "a freestanding determination" of what it calls "the true facts," which Chevron believes is "critical" to help persuade foreign courts to take its side in foreign enforcement proceedings. Chevron Br. 92 n.19. Its post-trial brief lays this strategy bare:

> Chevron intends to ask any foreign courts in which Defendants have initiated recognition or enforcement actions to consider this Court's injunction *and the findings supporting it*. On that basis Chevron believes it is likely that the foreign court would decline to award Defendants any relief, but any effect accorded to this Court's order would be the decision of the foreign court.

S.D.N.Y.-Dkt. 1847, at 343 (emphasis added). Put differently, Chevron wants this Court to "exercise its remedial power" to leave in place the district court's "factual

findings," so that Chevron can file them in far-flung jurisdictions in aid of its global anti-enforcement strategy—even as the enforcement decisions themselves, Chevron is quick to assure this Court, remain "the prerogative of courts in other nations," not this one. Chevron Br. 5, 92 n.19. Article III, however, does not sanction such advisory opinions.

Fortunately for this Court, "a far better remedy is available." *Naranjo*, 667 F.3d at 246. Indeed, it is mandated by our Constitution: "Instead of entertaining jurisdiction" here, in a case with "no immediate controversy between the parties since it is not certain that [Chevron] will ever be compelled to pay [the Ecuadorian] judgment," the Court should "dismiss[] the case as it is without jurisdiction." *Basic v. Fitzroy Eng'g, Ltd.*, 949 F. Supp. 1333, 1338 (N.D. Ill. 1996), *aff'd*, 132 F.3d 36 (7th Cir. 1997). This Court has already "agree[d] with the court in *Basic*" once. *Naranjo*, 667 F.3d at 246. It should do so again.

### A. Chevron has not shown that the alleged trial-level misconduct caused the substitute judgment of the three-judge appellate court.

To satisfy standing for any asserted injury, Chevron must prove that the injury is caused by "the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan*, 504 U.S. at 560. The insurmountable hurdle for Chevron is that it is attacking the wrong judgment. It alleges only trial-level improprieties concerning the provisional judgment, while its

asserted injuries all flow from the substitute judgment produced by the three-judge court after reviewing the record *por el merito de los autos*. That standard of review, this Court has recognized, is "similar to the American standard of de novo review" but "applicable to questions of both fact and of law." *Naranjo*, 667 F.3d at 237.

Although Chevron claims (at 103) that it "defies common sense" that the three-judge court applied the correct standard of review, Chevron spends most of the next 50 pages discussing the subject, and begins by lamely crying waiver.[1] Chevron's arguments go downhill from there, ultimately reaching the point of flyspecking the quality of the three-judge court's legal analysis.

But Chevron studiously avoids the elephant in the room: Scrutinizing an Ecuadorian appellate court's opinion is the role of the *Ecuadorian Supreme Court*, and it held—*in this very case*—that "there has been a correct weighing of the evidence in accordance with legal standards" in Ecuador. A-3605. As a result, the Supreme Court emphasized, "the court decision sought to be annulled here is the one rendered by the court of appeals, and not the one issued by [the] trial court, something which [Chevron] has confused." A-3548.

---

[1] We have not waived this argument. We repeatedly raised it in the district court, including in our motion to dismiss for lack of jurisdiction. *See* S.D.N.Y-Dkt. 1860, at 9-10. Regardless, "standing is not subject to waiver." *United States v. Hays*, 515 U.S. 737, 742 (1995).

Chevron cannot get around this decision. Its fraud case reduces to two basic allegations: that an expert report submitted at trial was prepared improperly and that the trial judge was influenced inappropriately. Let there be no doubt, Mr. Donziger vigorously contests these allegations. But what matters for causation is that the case then went to a three-judge appellate court, which did not include the trial judge and did not consider the report. And the Ecuadorian Supreme Court squarely held that the three-judge court reviewed the record de novo and produced a modified, substitute judgment. It is *that* judgment from which Chevron now seeks relief. That is fatal to Chevron's case for causation.

So Chevron clings desperately to the district court's odd conclusion that the Ecuadorian Supreme Court's decision is "inadmissible hearsay" because the question whether the standard of review was properly applied is "a question of fact, not law." Chevron Br. 116 n.28. But the whole purpose of Rule 44.1, as we said in our opening brief, was "to abandon the fact characterization of foreign law and to make the process of determining [foreign] law identical with the method of ascertaining domestic law to the extent" possible, and Chevron does not contend otherwise. 9A Charles Wright & Arthur Miller, *Fed. Prac. & Proc.* § 2444 (3d ed. 2014). There can be no serious dispute that whether an Ecuadorian court correctly applied the standard of review is a question of Ecuadorian law. Nor can there be any serious dispute that the Ecuadorian Supreme Court has resolved that question

10

in this case. So how can its holding—on the same issue, in the same case—not govern here?

Imagine that the shoe were on the other foot. Would a trial court in Ecuador be free to second-guess the U.S. Supreme Court's holding in *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165, 2175 (2014)—that there had been de novo review in that case—by asking whether there was *really* de novo review in that case, on the theory that the Supreme Court's decision is "hearsay"? On what basis would the foreign trial judge answer the question? Dueling amicus briefs, like those filed in this Court? Or would it just engage in armchair speculation about the finer points of appellate procedure, as the district court did here, from a continent away?

By disregarding the Ecuador Supreme Court's decision, the district court put itself in a position of having to make assumptions about how foreign judges discharged their duties under foreign law. That exercise is bound to end badly. And, sure enough, the district court's conclusion that de novo review was "impossible" here because there were "only five weeks" to review the record has already been proved false. Chevron itself has admitted that "even accounting for changes in the panel's membership, each judge had at least 147 days (approximately five *months*, not five weeks) to examine the record and resolve the appeal." ROE Br. 36. Perhaps Judge Rakoff was right, after all, when he concluded that it is "preposterous" to think that an American judge "is better

11

equipped than an Ecuadorian judge"—much less the Ecuadorian Supreme Court—"to apply Ecuadorian law" to an Ecuadorian dispute. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 552 (S.D.N.Y. 2001).

Ultimately, Chevron is forced to retreat back to its all-purpose "wholesale attack" argument, and to rely on a vague assertion that it has "proved various other injuries beyond those" caused by the substitute judgment. Chevron Br. 5. Neither is enough. The former falls apart on inspection, as discussed in Part III; the latter does not even spell out what these "other injuries" are, let alone how they were caused by the defendants or could be redressed by Chevron's requested relief.

## B. Chevron has not proved that its requested relief will likely redress an actual or imminent injury.

Even setting causation aside, Chevron "bears the burden" of proving the other two elements of standing: that the relief it requested at trial will *likely redress* an *actual or imminent injury*. *Lujan*, 504 U.S. at 560-61. This "requires careful judicial examination" of each asserted injury. *DaimlerChrysler*, 547 U.S. at 335. Chevron has not come close to carrying its burden.

### 1. *Unrelated arbitral award owed by Ecuador.* Chevron's first

attempt at a redressable injury is the claimed "loss of a $96 million arbitral award Chevron had obtained against the ROE." Chevron Br. 70. But Chevron has not "lost" that award. To the contrary, it has never sought to enforce the award in Ecuador, the Ecuadorian legislature has never appropriated any funds to satisfy the

award, and Chevron does not have any funds in Ecuador that could even be attached. So how could the "attachment" of the award cause Chevron any harm?[2]

Indeed, Chevron is currently seeking to enforce the award in the United States and prevailed in the district court, and the appeal is now pending in the D.C. Circuit. *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 60 (D.D.C. 2013), *appeal docketed*, No. 13-7103 (D.C. Cir.). If Chevron is ultimately able to enforce the award outside Ecuador, then it obviously hasn't been harmed by the award's attachment inside Ecuador. But the same is true even if it's unable to enforce the award outside Ecuador. The only way Chevron could possibly be harmed by the attachment is if it successfully sought to enforce the award *in Ecuador*—which it has neither done nor claimed that it will do—and then lost the money to satisfy the Ecuadorian substitute judgment. That is not a "certainly impending" injury. *Clapper v. Amnesty Intern.*, 133 S. Ct. 1138, 1150 (2013).

Then there's likely redressability—Chevron's "most obvious problem." *Lujan*, 504 U.S. at 568. Because no funds have been attached in Ecuador, the defendants have not received any money as a result of the award's "attachment." And they will not receive any in the future unless the following things all happen:

---

[2] Only the award had been "attached" in Ecuador; under Ecuadorian law, the treasury funds themselves may not be attached. *See Código Orgánico de Planificación y Finanzas Públicas*, art. 170 (Ecuador 2010) ("The resources of the Sole Treasury Account cannot be subject to attachment or to any kind of enforcement proceeding or provisional or injunctive measure.").

13

(1) Chevron seeks to enforce the award in Ecuador;

(2) Chevron succeeds;

(3) Ecuador's National Assembly decides to appropriate funds out of the nation's general tax revenues to satisfy the award;[3]

(4) Chevron decides to set up a bank account in Ecuador, thereby voluntarily subjecting itself to process in a country it has fled and from which it has removed all assets;

(5) the Republic of Ecuador tenders payment to that bank account;

(6) an Ecuadorian court decides to immediately redirect the money to the trust set up to satisfy the Ecuadorian judgment; and

(7) the trustee then decides to distribute the money in a way that allows it to go to Steven Donziger, rather than to land and water remediation or the satisfaction of debts.[4]

---

[3] Under Ecuadorian law, where "compliance [with a court order] necessitates disbursement of public resources, payment shall be funded through the budget appropriation for the respective entity." *Código Orgánico de Planificación y Finanzas Públicas*, art. 170 (Ecuador 2010).

[4] Alternatively, the Lago Agrio plaintiffs could try to lobby the Ecuadorian legislature to pay them the amount of the award directly, as they would surely like it to do (*see, e.g.*, Press Release, http://bit.ly/1uZgp6Z). After all, they have waited decades for someone to clean up their polluted homeland, while the harm continues unabated. But whether they will succeed in that effort is entirely too uncertain for likely redressability. Because their request, if granted, would not discharge Ecuador's obligation to satisfy the award, it would be tantamount to a gift from the sovereign Republic to the Lago Agrio plaintiffs—a quintessential policy decision too speculative to satisfy Article III. *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 614 (1989) (redressability cannot turn on "pure speculation" about how legislatures will decide to appropriate "general funds"). It also wouldn't remedy any *injury*, of course, because Ecuador would still owe Chevron the arbitral award.

Chevron has not even tried to "demonstrate the likelihood" of this exceedingly speculative scenario. *Heldman on behalf of T.H. v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992). Although it dismisses these acts as "ministerial" (at 71), "the decision of how to allocate" general tax revenue "is the very epitome of a policy judgment committed to the broad and legitimate discretion of lawmakers, which the courts cannot presume either to control or to predict." *DaimlerChrysler*, 547 U.S. at 345. For that reason, "[c]ourts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000); *Talenti v. Clinton*, 102 F.3d 573, 577-78 (D.C. Cir. 1996) ("A court is rightly reluctant to enter a judgment which may have no real consequence, depending on" the decisions of a foreign government "over whom it has no jurisdiction and about whom it has almost no information.").

  **2. *Ecuadorian trademarks of indirect subsidiaries.*** Next up to bat are the trademarks. Although Chevron provides few details, it claims a "loss of revenue streams" from trademarks attached in Ecuador two years ago. Chevron Br. 70. These trademarks seem to be held by various "indirect subsidiaries and affiliates of Chevron," and concern "industrial lubricants in Ecuador only," a country Chevron has fled. SA721; SA3693. Chevron has made no attempt, however, to offer any evidence (let alone "concrete evidence") or point to any facts

15

(let alone "specific facts") showing that its subsidiaries and affiliates have lost *any* revenue in the last two years as a result of the attachment of these trademarks. *Clapper*, 133 S. Ct. at 1149 n.4, 1154. So how, one might wonder, could a threatened future injury be "certainly impending" if no one has suffered any real injury to date? *Id.* at 1150. Chevron does not say.

But Chevron's real problem is likely redressability. On this question, even more so than injury, Chevron defaults. Rather than point to any evidence, Chevron simply asserts that the injury is "partially redressed by the constructive trust, which secures for Chevron any proceeds from [the attached trademarks] which flow to Appellants." Chevron Br. 70. That, of course, just begs the question. Chevron must prove (with concrete evidence) that it is "likely, as opposed to merely speculative" that the defendants will *actually receive* any proceeds from the trademarks. *Lujan*, 504 U.S. at 561.

It has to show, in other words, that the following events will likely all occur:

(1) the Republic of Ecuador will hold an auction of the trademarks at some point in the future;

(2) someone will decide to buy them;

(3) the buyer will pay enough that the proceeds will outweigh the costs of the auction;

(4) the Republic of Ecuador will decide to deposit the net proceeds into the trust created to distribute the damages owed under the Ecuadorian judgment and overseen by the Ecuadorian court; and

16

> (5) the trustee will decide to distribute the money in a way that allows it to go to Steven Donziger, rather than directing the funds to provide land remediation, pay others, satisfy debts, or to any number of possible higher priorities.

Not one of these events has occurred in the two years since the trademarks were attached. Each "requires action" by an independent actor not before the court, *Id.* at 571, and "guesswork as to how [they] will exercise their judgment," *Clapper*, 133 S. Ct. at 1150. Chevron cannot achieve standing by relying on such "speculation about the unfettered choices made by independent actors not before the court." *Id.* at 1150 n.5.

Because Chevron cannot possibly establish that all the necessary events will likely occur, it tries to shift the burden. It faults the defendants for failing to "offer [a] reason" why they will not occur. Chevron Br. 71. But that gets things backwards: To satisfy redressability, Chevron must "demonstrate the likelihood" by "adduc[ing] facts showing that," in this case, "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict ... have been or will be made in such manner as to produce causation and permit redressability of injury." *Heldman*, 962 F.2d at 157. Needless to say, Chevron has not done so.

### 3. Costs of defending against enforcement actions.

Chevron's final bid for standing is the weakest of all: "the expense of legal fees to defend current

and future enforcement proceedings." Chevron Br. 70. How will Chevron's relief redress this asserted injury when Chevron itself says (at 94) that "the relief here does not 'preclude the courts of every other nation from ever considering the effect of that foreign judgment'"? Indeed, in the district court, Chevron repeatedly made "clear that it is not seeking to enjoin the filing or litigation of foreign enforcement actions." S.D.N.Y.-Dkt. 1847, at 339. And the relief the court granted does not purport to do so. Far from it: The relief expressly exempts foreign enforcement actions from its scope.

That dooms Chevron's case for redressability. As the D.C. Circuit held in an opinion joined by then-Judge John Roberts: When the plaintiff's requested relief "would not do anything to redress the injury [it] suffers as a result of having to defend itself" in foreign litigation—because the plaintiff, "perhaps wisely, is not seeking to enjoin its adversary from pursuing litigation abroad"—then "the costs and burdens" of responding to foreign litigation will not create Article III standing. *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 454 (D.C. Cir. 2004). When that's the case, the plaintiff "simply cannot demonstrate it is 'likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision.'" *Id.* As in *Raytheon*, there is no "reason to believe" that the foreign enforcement actions

will be prevented by the relief sought here, and thus "the Company lacks Article III standing to sue." *Id.*[5]

One last point: The mechanics of standing doctrine, concededly, might seem dry or technical, at least when applied to a given case. Chevron surely thinks so. In the district court, as it was fumbling to try to find some injury that would satisfy all three elements, Chevron complained that our jurisdictional challenge was too "technical." S.D.N.Y.-Dkt. 1863, at 11. But, as this Court long ago explained, "[t]here is nothing 'technical'" in Article III's requirements, "unless all decisions in conformity with constitutional restraints on the powers of the federal judiciary are 'technical.'" *Cover v. Schwartz*, 133 F.2d 541, 551 (2d Cir. 1942). Nor is there anything "technical" in Chevron's strategic decision to rob Steven Donziger of his constitutional right to a jury. And there certainly isn't anything "technical" in ensuring that a federal court will not be transformed into a worldwide fact-finding commission, or a source of amicus briefs aspiring to influence the outcomes of foreign proceedings. Because Chevron admits that this is all it really wants from

---

[5] Chevron argues (at 72) that by enjoining U.S. enforcement and "denying [Donziger] the profits from any judgment against Chevron, the injunction will reduce the chances of further enforcement proceedings," which "is sufficient to satisfy the redressability requirement" under *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007). But the standard is "likely redressability"—not whether the relief "will reduce the chances" of future harm. As for *Massachusetts v. E.P.A.*, the Court *relaxed* the standing requirements in that case because it determined that Massachusetts was "entitled to special solicitude in [the] standing analysis" due to "its quasi-sovereign interests." *Id.* at 518, 520.

this Court—a "freestanding determination" of the facts, Chevron Br. 92 n.19—the Court must dismiss the case for lack of jurisdiction.

### C.   It is Chevron's burden to show that it had standing to seek its requested relief, not the defendants' burden to establish mootness.

Unable to carry its burden of establishing standing, Chevron takes the extraordinary position that it didn't have to—that it *never* had to show that the relief it requested at trial would likely redress a cognizable injury caused by the alleged wrongdoing. Instead, Chevron argues that it satisfied its obligation of establishing standing at trial because certain relief that it *wasn't* requesting—billions of dollars in damages and a global anti-enforcement injunction—*would have* given it standing. The reason for this, according to Chevron and the district court, is that "subject matter jurisdiction—including standing—is determined as of the time the action is brought," and the "defendants do not suggest that Chevron lacked standing when the action was brought." SPA-319-20; *see also* Chevron Br. 69. As a result, Chevron asserts, the question is really whether the defendants have established mootness, a "heavy" burden that requires showing that no effectual relief is possible, not whether Chevron has established standing. *Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).[6]

---

[6] Although Chevron does not do so, the district court drew support from Professor Monaghan's classic description of "mootness as the doctrine of standing (continued…)

20

But, again, "the party asserting federal jurisdiction when it is challenged has the burden of establishing it," *DaimlerChrysler*, 547 U.S. at 342 n.3, and this burden exists throughout "the successive stages of the litigation," *Lujan*, 504 U.S. at 561. A court cannot respond to standing challenges by simply "[a]ssuming the existence of a case or controversy" and then putting the burden on the defendant to show otherwise, as the district court thought. SPA-321. It must do the opposite: assume a lack of jurisdiction unless the plaintiff can show otherwise; "it is *[the plaintiff's]* burden to prove their standing by pointing to specific facts, not the [defendants'] burden to disprove standing." *Clapper*, 133 S. Ct. at 1149 n.4 (citation omitted).

True, standing "ordinarily depends on the facts as they exist when the complaint is filed," *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989), but the requirement does not go by the wayside thereafter, and certainly not when

---

set in a time frame." SPA-320 n.1231. But that description of mootness is "not comprehensive" because the same "conduct may be too speculative to support standing," which requires the plaintiff to establish an actual or "certainly impending" injury, "but not too speculative to overcome mootness," on which the defendant "bears [a] formidable burden." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000).

For example, in *Chafin v. Chafin*, cited by Chevron, a mother filed suit in federal court seeking an order returning her child to Scotland. 133 S. Ct. 1017, 1022 (2013). The district court granted the relief. The Supreme Court held that the child's return to Scotland "pursuant to such an order" did not moot "appeal of the order," regardless of whether the father could show that reversing the order ("typical appellate relief") would bring his daughter back. *Id.* at 1021, 1024-26. Because the issue was mootness, the standard was whether "it is impossible for a court to grant any effectual relief whatever," not redressability. *Id.* at 1023.

a plaintiff changes its requested relief. To the contrary, if a plaintiff "seeks new relief"—or, in Chevron's words (at 94), relief that is "qualitatively different from" the relief initially sought—then it "must show (and the District Court should have ensured) that [it] has standing to pursue it." *See Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring). Any other rule would allow a plaintiff to "sidestep Article III's requirements" by playing bait-and-switch with its requested relief. *Id.*

Chevron's only response is to draw a distinction between when a plaintiff "ask[s] a court to expand" an injunction, as in *Salazar*, *id.*, and when it "narrow[s] its request for relief," as in this case. Chevron Br. 69 n.13. From Article III's perspective, however, this makes no difference. Just as a plaintiff cannot "combin[e] a request for injunctive relief for which [it] *has* standing with a request for injunctive relief for which [it] *lacks* standing," nor can a plaintiff replace its request with relief that *wouldn't* likely redress an actual injury caused by the alleged wrongdoing. *Salazar*, 559 U.S. at 731 (Scalia, J., concurring). Were it otherwise, a plaintiff could do what Chevron did here: first ask for sweeping and unprecedented relief; later withdraw that request for strategic reasons (to avoid a jury and, Chevron hopes, another reversal by this Court); and then ask for different relief that doesn't redress an actual injury caused by the defendants, on the theory that "the remedy it initially sought" would have done so. SPA-324. That view makes no

22

sense, isn't supported by a single case cited by Chevron or the district court, and certainly isn't "horn book" law. *See* Chevron Br. 69 n.13.[7]

### D. Chevron does not deny that if the district court lacked jurisdiction, this Court should vacate its findings in their entirety.

Although Chevron contends that the district court had jurisdiction, it does not contest the consequence of a lack of jurisdiction: The court's findings must be vacated in their entirety. *See* Donziger Br. 82-84. Vacatur of the findings is particularly warranted here given that Chevron itself considers the findings to be "critical" relief (at 92 n.19)—and no court without jurisdiction is authorized to grant such relief. To do so would be "to act ultra vires." *Steel Co.*, 523 U.S. at 102.

Worse, to allow the findings to stand in this case would reward Chevron for using its unlimited resources to purchase made-up testimony from an admitted liar who accuses an American lawyer of bribing a foreign judge, without affording the accused a right to trial by jury. Indeed, Chevron does not deny that it has paid (and continues to pay) its star witness, Alberto Guerra, hundreds of thousands of dollars in cash and more than a million in benefits for his "bribery" tale, as detailed on page 54 of our opening brief. And indeed, Chevron makes no serious attempt to

---

[7] Chevron cites *Comer v. Cisneros*, 37 F.3d 775, 800 (2d Cir. 1994), for the proposition that a "plaintiff's loss of desire for the sought-after relief 'is really a mootness argument.'" Chevron Br. 69 n.13. But our argument isn't that Chevron has lost any *desire* for the sought-after relief; it's that Chevron *changed* the sought-after relief.

defend its actions. Its only response (at 31) is to dismiss the payments as mere "assistance" for Guerra's "relocation" from Ecuador. But Guerra, for one, viewed it differently: As Chevron does not dispute, he began changing his story as soon as Chevron started paying him, concocting new and contradictory allegations seemingly by the day to net him more money from Chevron.

Astonishingly, Chevron gives no explanation whatsoever for Guerra's lies or shifting narrative. It does not acknowledge the flimsiness of the corroborating evidence—despite having spent hundreds of millions of dollars trying to unearth something real—nor does it say anything about the contemporaneous emails that refute Guerra's account. And Chevron does not contest that, before it had Guerra, it tried to cook up a bribery scheme with one of its contractors (Diego Borja), later buying his silence after the scheme backfired and he was poised to expose its misdeeds to the world. Donziger Br. 15-19. On this point, too, Chevron is silent; it offers no defense at all of these payments. Under such troubling circumstances, this Court should have little hesitation vacating the district court's findings in full.

The findings should also be vacated for the additional reason that they disparage a country's entire judicial system, top to bottom, based on the testimony of "an avowed political opponent of the country's current President." *Naranjo*, 667 F.3d at 238. The findings have in fact *already* caused diplomatic friction, once again forcing the Republic of Ecuador to file an amicus brief defending the integrity of its

24

judges from a preemptive smear. As an illustration of the harm the findings have already done to foreign relations—and of why Chevron asks this Court (at 92 n.19) "to exercise its remedial power to uphold the … findings"—the Republic's brief states that "Chevron sought, and in Judge Kaplan found, a friendly forum to issue improper findings that it is already using in the pending arbitration against the Republic." ROE Br. 3. The Republic explicitly requests vacatur of "the District Court's extraordinary findings regarding the Republic and its judiciary." *Id.*

It is right to do so. No country deserves to be branded an "international pariah" by a court without jurisdiction, especially not based on the uncorroborated testimony of a disgruntled partisan. *Naranjo,* 667 F.3d at 242. And, by the same token, no defendant deserves to be branded a criminal by a court without jurisdiction, especially not based on the paid-for testimony of a perjured crook.

## II. Neither state nor federal law authorizes Chevron's preemptive collateral attack on the Ecuadorian judgment.

### A. New York law does not authorize preemptive collateral attacks on foreign money judgments.

When it comes to the basis for its common-law claim, Chevron hides the ball. The real question here is whether, under New York law, a judgment debtor may bring a preemptive action for relief from a money judgment entered in a foreign country—the action this Court rejected in *Naranjo*. Chevron dances around that question until page 167 of its brief, where it tries to convey the impression that

preemptive actions of this sort are routine. But Chevron cannot identify a single case (from any state, let alone from New York) that has allowed a preemptive collateral attack on a foreign money judgment despite the existence of the Recognition Act.

Chevron's failure to find any authority is unsurprising. As Chevron admits, the Recognition Act, enacted in 1970, was "a codification of pre-existing New York case law." Chevron Br. 169 (quoting *Island Territory of Curacao v. Solitron Devices*, 489 F.2d 1313, 1318 n.6 (2d Cir. 1973); *cf. Chase Manhattan Bank v. Hoffman*, 665 F. Supp. 73, 76-77 (D. Mass. 1987) (state's Recognition Act "supersedes any common law action" with respect to foreign money judgments). That's why this Court's analysis in *Naranjo* was explicitly grounded in "[t]he Recognition Act *and the common-law principles it encapsulates*." 667 F.3d at 241 (emphasis added). And *Naranjo*, as a matter of New York law, emphatically rejected the very thing Chevron seeks—an "affirmative cause of action to declare foreign judgments void and enjoin their enforcement." *Id.* at 240. It found that "Chevron's theory of relief" was not "consistent with New York law" and that there was "*no legal basis* for the injunction that Chevron seeks, and, on these facts, there *will be no such basis* until judgment-creditors affirmatively seek to enforce their judgment in a court governed by New York or similar law." *Id.* at 242 (emphasis added). It's hard to see how the Court could have been much clearer than that.

Yet, in an effort to bypass *Naranjo* and the Recognition Act, Chevron now argues that preemptive relief from a foreign judgment "is wholly distinct from judgment enforcement" and that allowing preemptive attacks would not "undermine the statute's goal of promoting recognition of New York judgments abroad." Chevron Br. 170. That argument is entirely at war with *Naranjo*, which went out of its way to explain why precisely the opposite is true—allowing preemptive collateral attacks *would* undermine the Recognition Act's goals and upset the international judgment-enforcement framework on which it is based. "Chevron," this Court explained, "would turn that framework on its head and render a law designed to facilitate 'generous' judgment enforcement into a regime by which such enforcement could be preemptively avoided." *Naranjo*, 667 F.2d at 241. To allow such a claim would thwart New York's policy decision to "act as a responsible participant in an international system of justice—not to set up its courts as a transnational arbiter to dictate to the entire world which judgments are entitled to respect and which countries' courts are to be treated as international pariahs." *Id.* at 242.[8]

---

[8] Chevron also cannot evade *Naranjo* by absurdly arguing that the defendants "have placed the recognition of the Ecuadorian court orders at issue in the course of this litigation." Chevron Br. 172. An impermissible preemptive collateral attack does not somehow become permissible because the defendant *defends against the case*. The same goes for the district court's logic that the defendants have made "a collateral estoppel defense or an effort to gain legal recognition of these decisions" (continued…)

This Court is bound by *Naranjo*'s interpretation of state law "absent a subsequent decision" by the state's highest court that "cast[s] doubt on that ruling." *Woodling v. Garrett Corp.*, 813 F.2d 543, 557 (2d Cir. 1987). But even if *Naranjo* didn't exist, Chevron would have no basis for preemptive attack on a foreign money judgment. The only two New York cases that Chevron cites (at 167) are more than 40 years old and do not "cast doubt" on *Naranjo*'s reading of New York law. Quite the contrary: Neither case involved foreign money judgments at all; both were divorce disputes. *Venizelos v. Venizelos*, 30 A.D.2d 856 (2d Dep't 1968); *Tamimi v. Tamimi*, 38 A.D.2d 197 (2d Dep't 1972). So they fall squarely outside the scope of the Recognition Act, which applies only to "any judgment of a foreign state granting or denying recovery of a sum of money, other than … a judgment for support in matrimonial or family matters." N.Y. C.P.L.R. § 5301. The same would have been true of Chevron's only other case—a 40-year-old California divorce case—had it been brought in New York. *Pentz v. Kuppinger*, 107 Cal. Rptr. 540 (Cal. Ct. App. 1973).

The New York courts have been clear that the Recognition Act only displaces the common law as to foreign judgments that "come directly within the scope of article 53." *Overseas Dev. Bank in Liquidation v. Nothmann*, 480 N.Y.S.2d 735,

---

in this case. SPA-422. The defendants repeatedly made clear below that they were *not* making such a defense. *See, e.g.*, Dist. Ct. Dkt. 1857, 34–35 ("So let there be no doubt—that defense is out of the case.").

738 (N.Y. App. Div. 1984). Chevron's cases don't. Because "article 53 is specifically limited to money judgments," this means that "other types of foreign judgments"— like divorce judgments—are "governed instead by common-law principles and existing case law," which "the Legislature did not intend to pre-empt." *Id.* The Recognition Act makes that intent clear; it specifically provides that the Act does not apply to judgments "not covered by this article." N.Y. C.P.L.R. § 5307.

Aside from two New York divorce cases (only one of which postdates the Recognition Act), Chevron's support for its common-law claims is feebler still: a two-sentence section in a treatise on New York law that cites no post-Act cases and discusses neither the Act nor the propriety of preemptive attacks[9]—and a case annotation from 1930, four decades before the Act's enactment.[10] One would think

---

[9] The most recent case cited in that section is from 1955—the decision of a trial judge in Monroe County, New York who *refused* to hear a preemptive attack on a judgment from Manhattan, concluding that he "should not entertain this action, but should relegate plaintiff to his right to move in the court in New York County which granted the judgment." *Harris v. Interstate Training Serv.*, 140 N.Y.S.2d 8, 11 (Sup. Ct. 1955). That hardly helps Chevron.

[10] That annotation, 64 A.L.R. 1136 (1930), concerns a highly controversial English case from the 1920s, *Ellerman Lines, Ltd. v. Read*, [1928] 2 K. B. 144, that preemptively enjoined a Turkish judgment. "But no previous case has been found which enjoins enforcement of a foreign judgment abroad," *Injunctions-Foreign Judgment-Enforcement Abroad Restrained*, 38 Yale L.J. 261, 262 (1928), and the English courts have repudiated *Ellerman*. "Parties have still moved for anti-enforcement injunctions of foreign decisions; however, they have not been successful." Mia Levi, *Inconsistent Application: Enforcing International Arbitral Awards in National Courts*, 27 N.Y. Int'l L. Rev. 47, 61 (2014) (citing Judge Kaplan's injunction as a lone outlier globally).

29

Chevron could do a bit better if it were true that "precedent firmly establishes" its common-law claim (it doesn't) or if courts really had allowed such claims "consistently" for "well over a century" (they haven't). Chevron Br. 65, 167.

But even assuming for the sake of argument that such a claim exists, its late-breaking appearance in this case should not be tolerated. Despite a 165-page complaint and a seven-week trial, Chevron failed to plead, or even mention, this mystery common-law claim before it made its first appearance in the district court's post-trial opinion. Chevron concedes as much, making the eye-popping argument that "the *district court* properly amended Chevron's complaint" after trial, and citing authority from this Court for the proposition that "a district court may amend a pleading." Chevron Br. 174 (citing *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985)). In fact, *Grand Light* discusses when "a district court may *allow a party* to amend its pleading." *Grand Light*, 771 F.2d at 680 (emphasis added). Chevron identifies no case involving anything remotely close to this *sua sponte* post-trial amendment.

The only argument Chevron pulls out of its hat is this: It is sufficient, says Chevron, that the shadow of some form of common-law equitable claim "entered the case" (Chevron does not say how, where, or by whom) in the context of an interlocutory appeal in a different case in which Donziger had a limited role as an intervenor. Nonsense. If a district court may amend the complaint to add a claim

so off-the-radar and nebulous that no reasonable litigant would have had notice of its existence or contours, then there is no point in even pretending that the proceedings were governed by the Federal Rules of Civil Procedure.

### B. RICO does not provide a vehicle for preemptive collateral attacks on foreign court judgments.

That leaves Chevron's federal claim. Chevron does not deny that it is attempting to invoke RICO as the basis for a preemptive collateral attack on a judgment. Nor does it deny that it seeks only equitable relief from the judgment—not the money damages authorized by RICO's private cause of action. 18 U.S.C. § 1964(c) (allowing an injured private person to sue for "threefold the damages he sustains"). RICO's text alone dooms that attempt. *See* Part IV.B, *infra*. Chevron does not even offer an argument based on RICO's text, structure, purpose, or history to suggest that Congress intended that RICO be used in this manner. Nor does Chevron identify a single case in which RICO has been employed to preemptively attack a court judgment. The circuits are in harmony: "[T]he remedies under RICO do not include setting aside a prior judgment" via "collateral attack." *Knight v. Mooring Capital Fund, LLC*, 749 F.3d 1180, 1187 (10th Cir. 2014) (collecting cases). A contrary holding would open the floodgates to dissatisfied litigants of all stripes.

Worse, Chevron asks this Court not only to break with all the other circuits on this point but to extend RICO further still, to authorize preemptive attacks on

the judgments of the courts of *foreign sovereigns*. But much of what this Court said of the New York Recognition Act is equally true of RICO: "Nothing in the language, history, or purposes of the Act suggests that it creates causes of action by which disappointed litigants in foreign cases can ask a [U.S.] court to restrain efforts to enforce those foreign judgments against them." *Naranjo*, 667 F.3d at 243. And taking that unprecedented step would multiply the pool of litigants seeking to relitigate their disputes in U.S. courts, transforming the Second Circuit into the world court of last resort. That, in turn, "would unquestionably provoke extensive friction between legal systems by encouraging challenges to the legitimacy of foreign courts in cases in which the enforceability of the foreign judgment might otherwise never be presented in New York." *Id.* at 246.

Chevron dismisses these concerns out of hand. "This case," in Chevron's view, "involves a straightforward application of RICO by one private party against another," nothing more, and there are simply no "'foreign relations' implications … that might result from the decision below." Chevron Br. 97. Such blithe assertions should provide this Court with little comfort, particularly because (as we pointed out in our opening brief at 94-97) the federal reports already contain many examples of collateral attacks "dressed up" as RICO suits, *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 511 (7th Cir. 1996), including attempted attacks on

foreign proceedings. *See, e.g., Gulf Petro Trading Co. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 749 (5th Cir. 2008).

Apart from distinguishing our cases on their facts, Chevron offers no limiting principles that would prevent the floodgates from opening wide, no framework for limiting the harm to international comity, and no acknowledgment that such harm is likely. Instead, Chevron ridicules the "parade of global litigants imagined by Donziger" as a fiction, suggesting that background limits like personal jurisdiction will be enough to stem the tide. Chevron Br. 95. But given New York's role as the world center of law and finance, much hard-fought litigation, from Brazil to Botswana, will have some local nexus that can be exploited by litigation losers eager to employ the unique jurisprudence that would arise from a win for Chevron. *See* U.S. Chamber Amicus Br. 1-2 (in light of increased litigation with "transnational businesses being filed in courts outside the United States," "it would be a mistake to conclude" that similar litigation is "unlikely to recur").

Yet another reason to resist the proposed transformation of RICO is that it would implicate serious separation-of-powers concerns by needlessly injecting the courts into foreign affairs. With its unnecessary attack on the systemic integrity on Ecuador's judiciary, the district court thrust itself into an arena that has been traditionally reserved for the political branches. Opening up our courts to such inquiries undermines the traditional delegation of decisions implicating

international relations to the President and Congress. That prospect of enabling a broad private right of action in the international arena "should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 695 (2004).

Simply put, the federal courts don't have a foreign policy. But allowing RICO suits like Chevron's would beckon private litigants seeking to preemptively challenge the particular and systemic merits of forums around the world, squarely injecting Article III judges into sensitive disputes. To see why this is so, consider how these disputes would play out. Presumably, foreign nations whose judiciaries are attacked will feel compelled to defend themselves, either as intervenors or amici, as Ecuador has. Would the State Department then feel compelled to inject itself into the fray, perhaps to defend U.S. allies in our own courts? And how would judges decide how much to honor American foreign policy in these disputes? A U.S. court preemptively weighing in on the adequacy of a foreign nation's judiciary is sure to have significant political and economic ramifications, and the current suit would not be the last to draw the attention of ambassadors and presidents. While the United Nations may be in New York City, the Second Circuit is not the world's court—nor is that the structure envisioned by our Constitution. Out of respect for the international comity, separation of powers, and the limited role of the federal

34

courts, this Court should decline to read RICO to permit unnecessary, preemptive attacks on foreign judgments and foreign judiciaries.

## III. Chevron is judicially estopped from making a wholesale attack on the integrity of the Ecuadorian judicial system and the evidence for that attack is inadequate in any event.

One would search in vain for a better illustration of the danger of such unnecessary, preemptive attacks than this very case and, in particular, the district court's sweeping takedown of Ecuador's legal system. That takedown is even more troubling because it accepts representations by Chevron directly contrary to those the company made when it asked to move this case to Ecuador in the first place, and when it promised this Court it would submit to jurisdiction there. Promises to a court have to mean something—a concept enshrined in the legal doctrine of judicial estoppel.

The district court, however, brushed aside that doctrine here. Hoping to insulate that holding from review, Chevron focuses on the standard of review for judicial-estoppel issues. Chevron asserts (at 120) that "all of the other circuits to have decided the question" have "adopt[ed] an abuse of discretion standard." But here is what the case that Chevron cites actually says: "our sister circuits are split as to whether dismissal on grounds of judicial estoppel should be reviewed *de novo*." *Lia v. Saporito*, 541 F. App'x 71, 73 n.1 (2d Cir. 2013). As *Lia* explains, the Sixth and D.C. Circuits both apply de novo review. *Solomon v. Vilsack*, 628 F.3d 555, 561 (D.C.

Cir. 2010); *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008). This Court has consistently applied de novo review on the understanding that judicial estoppel "is a pure question of law." *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 143 (2d Cir. 2005). Chevron has given this Court no persuasive reason "to reconsider [its] precedent favoring *de novo* review." *Lia*, 541 F. App'x at 73 n.1. In any event, the outcome here is the same regardless because the district court "necessarily abuse[d] its discretion" when it based its denial of judicial estoppel on "an erroneous view of the law" and "a clearly erroneous assessment of the evidence." *Highmark Inc. v. Allcare Health Mgmt.*, 134 S. Ct. 1744, 1748 n.2 (2014).

**1.** Chevron first asserts (at 122) that its promise to abide by the Ecuadorian judgment (subject only to its defenses under the Recognition Act) is not grounds for estoppel because the "offer was [not] accepted or otherwise relied upon," "appears nowhere in any court opinion," and was not included in "the stipulation signed by the parties." But this Court has already heard and rejected that argument as a matter of law: "While the district court did not include Texaco's promise to satisfy any Ecuadorian judgment in its stipulation and order, an express adoption of the prior inconsistent position is not required. The court need only adopt the position 'in some manner, such as by rendering a favorable judgment.'" *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 389 n.4 (2d Cir. 2011). As the Court reasoned, Chevron assured the *Aguinda* court that it would satisfy an Ecuadorian judgment

because Chevron had a "well-founded belief that such a promise would make the district court more likely to grant its motion to dismiss." *Id.*[11] Now, years after the motion was granted on the basis of that promise, Chevron has changed its tune. This is precisely the "deliberate changing [of] positions according to the exigencies of the moment" that the doctrine of judicial estoppel proscribes. *New Hampshire v. Maine*, 532 U.S. 742, 743 (2001).

Nor can Chevron evade judicial estoppel simply by sowing doubt as to when—or whether—Texaco merged with Chevron. On this point, again, Chevron and the district court stand directly athwart the Second Circuit: "[I]n seeking affirmance of the district court's *forum non conveniens* dismissal, lawyers from ChevronTexaco appeared in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. In so doing, ChevronTexaco bound itself to those concessions." *Republic of Ecuador*, 638 F.3d at 389 n.3. Judge Kaplan rejected that holding of this Court, reasoning that this Court "had been misinformed" when it observed that ChevronTexaco had appeared in Court in *Aguinda*, and that "[e]ven assuming that [the lawyers who

---

[11] Both Chevron and the district court characterize this Court's "conclu[sion]" that Texaco's promises were "enforceable against Chevron," *Republic of Ecuador*, 638 F.3d at 389 n.4, as mere "dicta." SPA-417 n.1754; Chevron Br. 121 n.31. But that conclusion was essential to resolving "[t]he basic question" before the court: "whether Chevron's actions in pursuing BIT arbitration constitute a breach of those … promises." *Republic of Ecuador*, 638 F.3d at 396.

appeared] were Chevron employees at the time of the *Aguinda* appeal, they acted as attorneys for Texaco and their statements as Texaco's attorneys did not bind Chevron." SPA-469-470 n.1750. But this Court wasn't "misinformed": Chevron's lawyers in *Aguinda* explicitly asked "this Court [to] take judicial notice" that "Texaco merged with Chevron Inc. on October 9, 2001," and "ChevronTexaco, Inc." explicitly appeared on the signature page. Appellee Br. 10, 89 in *Aguinda v. Texaco, Inc.*, No. 2001-7756 (2d Cir., filed Dec. 20, 2001).

**2.** Aware that the Second Circuit has rejected these arguments before, Chevron devised—and the district court accepted—a new one: that judicial estoppel shouldn't apply because the "characteristics of the Ecuadorian courts" have changed since the promise was made. SPA-468. But in order to make that finding without any evidence of corruption in the appellate court or Supreme Court in this case, the district court had to find that the Ecuadorian judiciary, through and through, was—and is—incapable of "provid[ing] impartial tribunals or procedures compatible with due process of law"—a designation that U.S. appeals courts have given only to ayatollah-controlled Iran and war-torn Liberia. SPA-445. The court based its sweeping condemnation of Ecuador's judiciary almost exclusively on the testimony of partisan Álvarez Grau. The district court cited Álvarez's testimony more than 50 times in nine pages, SPA-431-440, and

Chevron, in turn, cites those pages 17 times in four pages (at 132-135) to show that the record "amply" supports its wholesale attack on the Ecuadorian judiciary.

But even Dr. Álvarez admitted that "it would be irresponsible" for anyone "to generalize that all of the judges and all of the justices, that all of the members of the legal branch are corrupt" based on his testimony. Republic of Ecuador Appendix, RA-2-3, Álvarez Dep. Tr. (Sept. 7, 2011) at 137:22-138:2. The district court apparently felt more at liberty to generalize.

Recognizing that the district court's sweeping condemnation of the Ecuadorian judiciary won't hold up, Chevron tries (at 123) to occupy the ostensibly more defensible position that Ecuador's judiciary is only incapable of delivering justice in "highly politicized" cases. But what belongs in Chevron's category of "highly politicized" cases? Surely, if anything, cases between President Correa's government and Chevron itself would fit the bill. But did Chevron believe the Ecuadorian courts were incapable administering justice when Texaco won a $1.5 million judgment against Correa's government in 2007? RA-388-89. Or when an Ecuadorian appellate court reversed a lower court's dismissal of another multi-million-dollar Texaco suit against Ecuador in 2008? RA-350. What about when an Ecuadorian court dismissed charges against Chevron lawyers in 2011? RA-248.

Chevron seems to have gerrymandered a category of "systemic inadequacy" that includes just one case: "this one." Chevron Br. 130. Because Chevron can't

show that the appellate judges (or the Justices of the Ecuador Supreme Court) were corrupt, biased, or unqualified, it hopes to persuade this Court that Ecuador's judiciary was "systematically corrupt" in this case alone. That's an oxymoron.

## IV. Chevron has established neither a cause of action under RICO nor an entitlement to equitable relief.

### A. Chevron has not met RICO's statutory prerequisites for a private right of action.

As we explained in our opening brief, RICO imposes injury and causation prerequisites that are "more rigorous" than Article III's. *Denney v. Deutsche Bank AG*, 443 F.3d 253, 266 (2d Cir. 2006); *see* 18 U.S.C. § 1964(c). Chevron comes up short on both: It has not established a cognizable RICO injury that would be likely redressed by its requested relief, nor has it shown that the alleged RICO violations are the but-for and proximate causes of any such injury.

**1. *RICO Injury*.** Unlike the district court, Chevron does not deny that it must establish an "actual, quantifiable" RICO injury with "proof of concrete financial loss." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224–25 (2d Cir. 2008); *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc); *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000) (RICO requires "proof of actual monetary loss, *i.e.*, an out-of-pocket loss."). Nor does Chevron contest that "the amount of damages" must be "clear and definite," *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003), so that if "damages are still unknown," the injury

40

will be too "speculative" and "unprovable" for RICO. *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, 347 F. App'x 711, 713 (2d Cir. 2009).

But Chevron makes almost no effort to actually meet these strict requirements. It again relies primarily (at 78) on the attachment of the Ecuadorian trademarks and the arbitral award. Even assuming those are cognizable injuries under Article III (which they are not), neither is cognizable under RICO.

As for the trademarks, they are owned by Chevron's subsidiaries, not Chevron, and Chevron cannot "bring an individual action under RICO to redress injuries" to its subsidiaries. *See Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993) (holding that a plaintiff lacks standing to do so even if "the plaintiff is the sole shareholder of the injured corporation"); *see Bixler v. Foster*, 594 F.3d 751, 756-57 (10th Cir. 2010) (following the "uniform holdings of other circuits" that "corporate shareholders do not have standing to sue under the civil RICO statute for alleged injuries to the corporation"); *cf. Petroleum Enhancer, LLC v. Woodward*, 690 F.3d 757, 770 (6th Cir. 2012) ("[A]n 'injury arising solely out of harm to a subsidiary corporation is generally insufficient to confer standing on a parent corporation.'" (quoting 9 William M. Fletcher, et al., *Fletcher Cyclopedia of the Law of Corporations* § 4227 (2010)). Chevron must therefore show that it has "sustain[ed] an injury that is

41

separate and distinct from [any] injury sustained by" its subsidiaries. *Id.* It hasn't even tried.

As for the arbitral award, Chevron hasn't lost any money that it would have received but for the alleged RICO violations. To the contrary, as previously explained, Chevron is seeking to enforce the award in the United States and prevailed in the district court. *Republic of Ecuador*, 949 F. Supp. 2d at 60. There is simply no way that the Ecuadorian court's "attachment" of the award has caused any concrete financial loss to Chevron. "[A] plaintiff who claims that a debt is uncollectible because of the defendant's conduct" must first show that its "rights to payment have been frustrated" by the alleged RICO violations before bringing a claim. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) ("RICO injury is speculative when … legal remedies remain which hold out a real possibility that the debt, and therefore the injury, may be eliminated.").

Probably aware that these injuries will not carry the day, Chevron tries to find a few more. It makes a vague reference to "harm to reputation and goodwill," as well as to the legal fees it spent in its own "discovery actions." Chevron Br. 77. But these injuries are unquestionably inadequate under RICO. The "generalized reputational harms alleged" are too indirect, vague, and "speculative to constitute an injury to business or property." *Kimm v. Chang Hoon Lee & Champ, Inc.*, 196 F.

App'x 14, 16 (2d Cir. 2006). Nor would they be redressed by Chevron's requested relief. The same goes for the legal fees Chevron has incurred, which were not directly caused by any alleged RICO violations, and are also neither clear nor definite. Just as a plaintiff cannot "manufacture standing" under Article III through "self-inflicted injuries," *Clapper*, 133 S. Ct. at 1151-52, it cannot bootstrap a RICO claim by relying on the costs of *uncovering* an alleged "fraudulent scheme" as the legally cognizable injury *inflicted* by that scheme.

**2. *RICO Causation.*** Even assuming that Chevron could clear RICO's injury hurdle, it cannot get past RICO's causation requirement. For whatever injury Chevron claims, it "must show that the RICO violation was the but-for (or transactional) cause of [that] injury, meaning that but for the RICO violation, [it] would not have been injured." *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010); *see also Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010). Under "traditional principles of but-for causation," Chevron must provide "proof that [its asserted injury] would not have occurred in the absence of the alleged wrongful action or actions." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Chevron makes no attempt—none whatsoever—to meet this bedrock requirement. One can combine Chevron's nearly 200-page brief in this Court, its nearly 400-page post-trial brief below, and the district court's nearly 600-page

43

opinion and appendices, and still find only a single conclusory sentence even attempting to meet this critical prerequisite. *See* SPA-416 (court's unexplained assertion that "Chevron's injuries are not attributable to a cause independent of defendants' ghostwriting, bribery and other misconduct."). That's not enough.

Because all of Chevron's possible RICO "injuries" would have occurred even if a much, much smaller judgment were entered against it, Chevron must effectively show that there would be *no* judgment against it in Ecuador but for the alleged wrongdoing. As a matter of logic, Chevron cannot do so. Although it originally sought to prove that the environmental lawsuit in Ecuador was nothing but "sham litigation," S.D.N.Y.-Dkt. 1 at 2, Chevron later dropped any attempt to contest its environmental liability. And when the defendants tried to submit evidence of Chevron's contamination in Ecuador, the district court ridiculed their attempts as "a joke" and refused to let them do so. Tr. 501-2. But RICO causation is no joke, and it is certainly "relevant to this action." Chevron Br. 147 n.42.

That is to say nothing of proximate causation. As already discussed, none of Chevron's asserted injuries (at least no redressable, cognizable injury) was proximately caused by the alleged improprieties in the Ecuadorian trial court. The Ecuadorian intermediate court reviewed the record de novo and produced a substitute judgment, which the Supreme Court of Ecuador affirmed. Thus, Chevron cannot show that "the alleged violation *led directly* to the plaintiff's

44

injuries," as RICO requires. *Anza v. Ideal Steel Corp.*, 547 U.S. 451, 461 (2006). And although Chevron seeks to get around this problem by making several vague and unsubstantiated references to "other injuries [it] sustained that are distinct from the Lago Agrio judgment itself," it does not say what these are. Chevron Br. 79-80. Both Article III and RICO demand more.

## B. RICO does not authorize a private cause of action solely for equitable relief.

In defending the district court's grant of equitable relief under RICO, Chevron argues that any plaintiff "*authorized to bring an action*" under RICO is entitled to equitable relief—either under 18 U.S.C. § 1964(a)'s broad authorization of "appropriate orders" or a district court's general authority to issue ancillary relief in support of a judgment. Chevron Br. 82 (emphasis added). But that proposition—on which this Court has expressed doubts and a majority of other courts disagree—is largely beside the point here because RICO does *not* authorize Chevron to bring an action solely for equitable relief. The private right of action spelled out in § 1964(c), by its plain language, provides a right of action for *damages*. Thus, even assuming equitable relief is ever appropriate *in addition to* money damages (as Chevron asserts), it would still not be appropriate *in place* of them.

The statutory language is straightforward: it says that "[a]ny person injured in his business or property by reason of a violation of [RICO] may sue therefor in any appropriate United States district court and shall recover threefold the

45

damages he sustains." 18 U.S.C. § 1964(c). That is the *only* cause of action the statute provides private parties, and it is expressly limited to claims for *damages*. A private plaintiff not seeking damages, therefore, has no RICO cause of action and is entitled to no relief under the statute, equitable or otherwise. On that, the authorities are unanimous. No case or authority holds to the contrary, and Chevron cites none.

The Seventh Circuit has not held, as Chevron asserts, that § 1964(a) includes a "general grant of authority for district courts to enter injunctions." Chevron Br. 82 (citing *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 696 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003)). Whatever the meaning of § 1964(a), it cannot be read as a freestanding grant of authority for district courts to order equitable relief where the relief is not tethered to a plaintiff's assertion of a valid cause of action. Both the plain language of § 1964(c) and Article III's limitation of the judicial power to cases and controversies prohibit that result. Fundamentally, "[f]ederal courts cannot reach out to award remedies when the Constitution or laws of the United States do not support a cause of action." *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74 (1992).

*Scheidler*'s holding is in fact much narrower than Chevron suggests. Although the Seventh Circuit did uphold injunctive relief, the plaintiffs there—as our opening brief explains—also sought and were awarded more than $250,000 in a

jury trial. *Scheidler*, 267 F.3d at 693. Accordingly, the injunctive relief in *Scheidler* was predicated on the district court's finding that the plaintiffs had "been injured in their business or property by reason of a RICO violation" and stated a claim under RICO's private right of action. *Id.* at 696. So even if it were true that § 1964(a) "sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek," a plaintiff not seeking damages is not "authorized to bring suit" and thus not entitled to *any* relief under RICO. *Id.*

In addition to § 1964(a), Chevron relies on a federal district court's general authority to enter appropriate relief in support of a judgment—a theory adopted by Judge Rakoff in *Motorola Credit Corp. v. Uzan*, 202 F. Supp. 2d 239 (S.D.N.Y. 2002), *rev'd on other grounds*, 322 F.3d 130 (2d Cir. 2003). But, again, a district court's power to enter such relief is not an unlimited authority to enter injunctions as the court sees fit, unmoored from a valid cause of action. That would be an invitation for district courts to enter orders in the absence of a concrete case or controversy between parties—the definition of an advisory opinion.

Thus, even assuming the correctness of Judge Rakoff's view that a district court has inherent power to order equitable remedies ancillary to a RICO judgment, the court's authority to enter such relief must depend on the existence of a cause of action over which the court has jurisdiction—namely, RICO's private right of action for damages. That was the case in *Uzan*, which involved $2.7 billion

47

in damages *in addition to* the claimed equitable relief. 202 F. Supp. 2d at 242. As in *Scheidler*, Judge Rakoff's injunction in *Uzan* depended on the existence of those damages claims. *Id.* at 244 (holding that § 1964(c) provides "a private right of action *for damages*" (emphasis added)). Indeed, Judge Rakoff has elsewhere expressly repudiated Chevron's position that RICO authorizes injunctive relief in the absence of a damages claim. As his RICO treatise explains: "Civil RICO claims are *only* available where monetary relief is sought … Thus, if the suit is in essence a claim … for injunctive relief, RICO will not be a suitable vehicle." Jed S. Rakoff, *RICO: Civil and Criminal Law and Strategy* § 7.022 (2014) (emphasis added).

Chevron's only response to these points is its general assertion that there is "no support in the law for Donziger's assertion that equitable relief must be coupled with an award of monetary damages." Chevron Br. at 86. But the support is § 1964(c)'s express limitation to damages claims. If Chevron wants to set aside that statutory limitation to create a *new* equitable cause of action under RICO then it is Chevron that should be expected to cite authority—or at least compelling reasons—for setting aside the statutory text. It has not done so.

Adherence to the statute's text on this point is no mere technicality. By limiting RICO's extraordinary powers of quasi-criminal prosecution to private parties seeking damages, the statute ensures that nobody may be branded a criminal without the safeguard of a trial by jury. Chevron's decision to abandon its

48

damages claims on the eve of trial was a tactical one, designed to deprive Mr. Donziger of his Seventh Amendment rights. Chevron must now live with its decision: by abandoning its damages claims, it abandoned its cause of action under RICO and any claim to relief under the statute.

### C. As the majority of courts have held, equitable relief is *never* available to private parties under RICO.

Section 1964(c)'s creation of a private right of action for "damages" establishes, at the very least, that a valid damages claim is a prerequisite to any award of relief under RICO. But many courts—including this one—have suggested that § 1964(c)'s limit to actions for "damages" has a deeper significance: by granting private litigants a right of action for damages while saying nothing about other forms of relief, Congress expressly limited available relief to the form it specified. In the face of Congress's statutory choice, courts are not free to add *additional* forms of relief. *See Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 445–46 (S.D.N.Y. 2008) (a court interpreting RICO's private right of action "can neither infer a meaning that is unexpressed, nor ignore Congress's seemingly willful silence

on the matter").[12]

Chevron does not dispute that the language of § 1964(c)'s cause of action expressly mentions only damages. Instead, it finds support for its equitable remedy in the "plain language" of § 1964(a), a *separate* subsection that, on its face, broadly grants district courts "jurisdiction to prevent and restrain violations of section 1962" through "appropriate orders." It is true, as Chevron asserts, that § 1964(a), when read in isolation, does not limit the identity of parties who may obtain such "appropriate orders" under the statute. But the subsection does not appear in isolation. The question of *who* may invoke subsection (a) is spelled out in the next paragraph, which authorizes only "[t]he Attorney General" to "institute proceedings under [the] section." 18 U.S.C. § 1964(b). As Solicitor General Olson explained to the Supreme Court in *Scheidler*, "the sole authority to seek final and interim injunctive relief against racketeering activities and enterprises is given to the Attorney General." Br. of U.S., at 7, in *Scheidler* (No. 01-1119). In contrast, the private right of action in subsection (c) does not refer to proceedings under the section at all—instead it creates a separate procedure, allowing plaintiffs to "sue …

---

[12] The same issue is now before this Court in *Sykes v. Harris & Assocs.*, No. 13-2742. Leucadia Corporation (represented by the same firm that represents Chevron here) argues forcefully that "the RICO statute does not afford injunctive relief to private parties. Indeed, the text and history of the RICO statute show that Congress affirmatively decided not to authorize private injunctive claims." Leucadia Br. 15-16.

in any appropriate United States district court." 18 U.S.C. § 1964(c).

The structure of RICO's civil remedies section, and the linked nature of subsections (a) and (b), makes sense in light of the statute's development. The Senate bill that eventually became RICO included what later became Section 1964(a) and (b), but contained no private right of action. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 486 (1985) ("The civil remedies in the bill passed by the Senate, S. 30, were limited to injunctive actions by the United States…"). Subsections (a) and (b) mimicked—and still do—Section 4 of the Sherman Act, 15 U.S.C. § 4, which the Supreme Court had construed to authorize injunctive actions only by the *government*, not by private parties. *See Minnesota v. N. Sec. Co.*, 194 U.S. 48, 70–71 (1904). If Congress had "intended a private RICO plaintiff to be able to obtain injunctive relief, it surely would have avoided language that had previously been held by the Supreme Court not to permit such relief." *DeMent v. Abbott Capital Corp.*, 589 F. Supp. 1378, 1383 (N.D. Ill. 1984).

The private right of action—subsection (c)—was added only later, in committee by the House, without changing the remainder of Section 1964, and was "modeled … on the civil-action provision of the federal antitrust laws, [Section] 4 of the Clayton Act." *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267 (1992); *Sedima*, 473 U.S. at 489; H.R. Rep. No. 91-1549, at 35, 58 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4007, 4010, 4034. "[T]he House Committee's addition of the

private damages remedy" thus did "not alte[r] the public-action thrust of the other subsection[s] of S. 30." *DeMent*, 589 F. Supp. at 1383 (citation omitted). And its model in the Clayton Act, Section 4, was understood to allow private actions only for *damages*—as the Supreme Court had previously construed it. *See Paine Lumber Co. v. Neal*, 244 U.S. 459, 471 (1917) ("[A] private person cannot maintain a suit for an injunction under [Section] 4 of the [Clayton Act].").

Indeed, two separate amendments that would have authorized private injunctive actions were proposed and rejected by the House—once in committee and again on the chamber floor. *See* 116 Cong. Rec. 27,739 (1970) (committee); *id.* at 35,228; 35,346 (floor); *see also Sedima*, 473 U.S. at 487. The sponsor of both, Congressman Steiger, complained that the bill passed by the House "fail[ed] to provide … [an] important substantive remed[y] included in the Clayton Act: … equitable relief in suits brought by private citizens." 116 Cong. Rec. 35,227; 35,228 (1970). But other members were concerned about "the potential consequences that this new remedy might have," and so Mr. Steiger's amendments were omitted from the final bill. 116 Cong. Rec. 35,346 (remarks of Rep. Poff); *see also Agency Holding Corp. v. Malley-Duff & Assoc.*, 483 U.S. 143, 154–55 (1987) (citing 116 Cong. Rec. 35,346). Subsequent Congresses have twice considered "broaden[ing] even further the remedies available under RICO" by "permit[ing] private actions for injunctive relief," *Agency Holding Corp.*, 483 U.S. at 155, and both times have declined to do so.

52

*See* S. 16, 92d Cong. (1972); S. 13, 93d Cong. (1973).

Based on the statute's language and structure, it is not surprising that most courts that have addressed the question have concluded that RICO's civil-damages provision means what it says: plaintiffs are entitled to damages, not injunctions and other equitable relief. *See, e.g., Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986) (holding equitable relief is "not available to a private party in a civil RICO action"). And while this Court has "never definitively ruled on the issue" whether RICO permits a private plaintiff to seek injunctive relief, *Uzan*, 202 F. Supp. 2d at 243, the Court has expressed strong doubts about whether such relief is available. "It seems altogether likely," the Court wrote in *Sedima, S.P.R.L. v. Imrex Co. Inc.*, "that [RICO] as it now stands was not intended to provide private parties injunctive relief." 741 F.2d 482, 489 n.20 (2d Cir. 1984), *rev'd on other grounds*, 473 U.S. 479 (1985); *see also Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28–29 (2d Cir. 1983) ("We have the same doubts as to the propriety of private party injunctive relief.").

As in *Sedima* and *Trane*, this Court need not definitively answer that question in this case, and may thus avoid wading into the growing split in authority. Because Chevron has no damages claim, it has no cause of action under RICO and thus no claim to relief under *any* of RICO's civil-remedies subsections, including § 1964(a). This Court need go no further to decide this case.

**D.    Even if equitable relief were available as a general matter, it is unwarranted here.**

The Supreme Court has emphasized that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "[C]ourts of equity should not act" where, as here, "the moving party has an adequate remedy at law and will not suffer irreparable injury if denied injunctive relief." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The same requirements apply to a constructive trust, which "is not appropriate when remedies exist at law and elsewhere." *United States v. Khan*, 129 F.3d 114 (2d Cir. 1997). Chevron asserts that the district court was "well within its discretion" in granting the anti-enforcement injunction and worldwide constructive trust. Chevron Br. 92. But at least three adequate remedies exist at law. And Chevron has barely attempted to prove irreparable injury.

**1. *Chevron has several adequate remedies at law.*** Chevron never once tries to explain why it cannot avail itself of the most "obvious alternative remedy"—raising its defenses in an enforcement proceeding—which this Court has described, in this very litigation, as "not only a 'better' approach," but one that would still allow Chevron to "argue the same points" against the Ecuadorian judgment. *Naranjo*, 667 F.3d at 245. If an entitlement to equitable relief is defeated by the existence of only an "adequate" remedy, then it must certainly be defeated

54

by this "obvious" and "better" alternative remedy. And it is black-letter law that, where the "plaintiff can assert the claim as a defense in some other proceeding, the alternative remedy is adequate." 11A Wright & Miller, *Fed. Prac. & Proc. Civ.* § 2944 (3d ed.); *see State of Georgia v. City of Chattanooga*, 264 U.S. 472, 483-84 (1924). Chevron doesn't deny its ability to defend itself in an appropriate enforcement proceeding. "[I]t is difficult to see what remedy, more nearly perfect and complete," Chevron can have "than is afforded [it] by [its] right to make defence at law." *Phoenix Mut. Life Ins. v. Bailey*, 80 U.S. 616, 623 (1871); *accord Reisman v. Caplin*, 375 U.S. 440, 443 (1964). Where, as here, "a far better remedy is available," *Naranjo*, 667 F.3d at 246, equitable relief of any kind is impermissible.

Chevron also has adequate remedies in Ecuador itself, one of which it has already invoked: an action before the Constitutional Tribunal of Ecuador alleging a denial of due process. And Chevron does not deny that it has the ability to seek relief from the judgment under Ecuador's Collusion Prosecution Act, but has chosen not to do so. Rather than address the merits of these legal remedies in the forum, Chevron (at 177) simply falls back on its broad condemnation of the entire Ecuadorian judiciary. Chevron's failure to address either of these remedies in any depth underscores the unnecessarily preemptive nature of this unusual proceeding.

**2. Chevron has not shown irreparable injury.** Nor can Chevron show that it will suffer irreparable injury if it is denied equitable relief in this proceeding.

Again, Chevron can raise the same challenge "as a defense in [an] enforcement proceeding," where "any harm alleged" could "be remedied by a favorable ruling." *Morgan Drexen, Inc. v. CFPB*, 979 F. Supp. 2d 104, 112 (D.D.C. 2013). Chevron's sole attempt to establish irreparable injury is through a vague reference, without explanation, to injuries to its "reputation, goodwill, and ability to conduct business." Chevron Br. 92. Where exactly has this harm to Chevron's reputation and ability to conduct business occurred? Is Chevron suggesting that the lawsuit predicated on redressing harm to thousands of Ecuadorian villagers and a vast swath of the Amazon damaged its reputation, but that the 15.834 billion gallons of petroleum product that it admits to dumping into Amazonian waterways did not? Is accountability somehow more hurtful to Chevron's "goodwill" than decades of litigious attempts to escape it? Chevron cannot establish irreparable injury through such vague and conclusory statements. Even if Chevron had suffered real injury, the way to repair it is through a defense in an enforcement proceeding. The only plausible harm here would be the additional litigation cost of having to face enforcement proceedings. Not only are those proceedings inevitable, but courts have uniformly recognized that "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974). Chevron therefore "suffers no

56

damage before having an opportunity to assert [its] defenses." *High Adventure Ministries, Inc. v. C.I.R.*, 726 F.2d 555, 558 (9th Cir. 1984).

   **3. The constructive trust was unwarranted.** Even if equitable relief were otherwise appropriate, Chevron cannot show an entitlement to a constructive trust on Donziger's contingency interest in the Ecuadorian judgment. Entitlement to the remedy turns on four elements: (1) a fiduciary relationship between the parties, (2) a promise, (3) an asset transfer in reliance on the promise, and (4) unjust enrichment flowing from a breach of the promise. *Mei Yun Chen v. Mei Wan Kao*, 97 A.D.3d 730, 730 (N.Y. App. Div. 2012). Though equity is flexible, courts frequently deny constructive trusts when a party fails even a single element. *See, e.g., Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 785 (S.D.N.Y. 2011) (Kaplan, J.). Here, Chevron can't possibly satisfy *any* of these elements: There is no fiduciary relationship, no promise, and no reliance—and nobody contends otherwise. The district court correctly recognized that "the key is unjust enrichment," SPA-487 n.1812, but it previously dismissed Chevron's unjust enrichment claim as premature. S.D.N.Y.-Dkt. 468 at 47. "As the Donziger Defendants have not recovered on the Judgment to date," it held, "the unjust enrichment claim is premature at best. The essence of an unjust enrichment claim is that one party *has received* money or a benefit at the expense of another." *Id.* (emphasis added); *see also Restatement (Third) of Restitution and Unjust Enrichment* § 55 (2011).

57

In any event, the constructive trust granted by the district court is a remedy at law, not equity, and Chevron circumvented a jury trial by promising to "seek only equitable relief." S.D.N.Y.-Dkt. 469. The trust does not attach to an *existing, traceable* asset (a remedy available at equity), but instead to a *contingent, future* interest in the judgment (a remedy available only at law). *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002). For that reason, too, the constructive trust fails.

## V. In the event of a remand, this case should be reassigned to a different district judge.

This Court should "dismiss the present claim[s] in [their] entirety," *Naranjo*, 667 F.3d at 239, leaving no room for a remand. But if there is a remand, the case should be reassigned. "Reassigning a case to a different district judge, while not an everyday occurrence, is not unusual in this Circuit," and is "simply a mechanism that allows the courts to ensure that cases are decided by judges without even an appearance of partiality." *Ligon v. City of New York*, 736 F.3d 118, 128-29 (2d Cir. 2013). It "does not imply any personal criticism of the judge." *Id.*

Given this litigation's history, the "original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his … mind previously-expressed views or findings" and "reassignment is advisable to preserve the appearance of justice." *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 147 (2d Cir. 2000). Take, for example, the judge's position on the Ecuador Supreme Court: "Believe me, if this were the High Court in London, you can be sure I'd wait."

S.D.N.Y.-Dkt. 287-1 (Hearing Tr. 4/30/10, at 35:9-36:10). The same goes for the judge's "visceral judgment on appellant's personal credibility," *Cullen v. United States*, 194 F.3d 401, 408 (2d Cir. 1999)—referring to Mr. Donziger's litigation strategy, early on, as "a giant game" in which "Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit." *Chevron v. Naranjo*, 11-1150-cv S.D.N.Y.-Dkt. 287-5 ("*Naranjo* Docket") (Hearing Tr. 11/22/10, at 26:19-24). The "firmness" with which the judge established these determinations from the outset also favors reassignment. *Hispanics for Fair & Equitable Reapportionment v. Griffin*, 95 F.2d 24, 26 (2d Cir. 1992). Both of Chevron's surviving claims originated with the judge, who initially asked (*before* the complaint was filed) if "the phrases Hobbs Act, extortion, RICO, have any bearing here?" (S.D.N.Y.-Dkt. 1 (quoting hearing transcript)) and then took it upon himself to amend Chevron's complaint (*after* the bench trial) to include a new common-law theory. The judge admits that he "got it from the beginning." *Naranjo* Docket, 287-5 (Hearing Tr. 11/22/10, at 26:13). All this raises at least "a suspicion of partiality"—no more is required. *United States v. Simon*, 393 F.2d 90, 91 (2d Cir. 1968).

Nor would reassignment "entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Mackler Prods.*, 225 F.3d at 147. To the contrary, "[w]here the judge sits as the fact-finder, reassignment is the preferable course, since it avoids any rub-off of earlier error." *United States v. Robin*,

553 F.2d 8, 10 (2d Cir. 1977). And "where a judge has repeatedly adhered to an erroneous view after the error is called to his attention"—as demonstrated by the court's inability to adhere to *Naranjo* and other prior precedents of this Court—reassignment avoids "an exercise in futility (in which) the Court is merely marching up the hill only to march right down again." *Id.* at 11. Because "the contentions of the parties in this difficult and complex matter have taken a toll on all involved," the case should "be reassigned to another judge upon remand." *United States v. Quattrone*, 441 F.3d 153, 192 (2d Cir. 2006).

## CONCLUSION

The district court's judgment should be reversed, its factual findings should be vacated, and this action should be dismissed in its entirety. A remand for further proceedings is unnecessary, but in the event of a remand the case should be reassigned to a different district judge.

Respectfully submitted,

*/s/ Deepak Gupta*

Deepak Gupta
Gregory A. Beck
Jonathan E. Taylor
GUPTA BECK PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741

Justin Marceau
John Campbell
University of Denver

60

Sturm College of Law
2255 E. Evans Avenue
Denver, CO 80208
(303) 871-6000

November 25, 2014

*Counsel for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC*[13]

---

[13] Counsel gratefully acknowledge the contributions of the following law students: Brycen Williams, Bradley Kloewer, Ashley Basta, Mary Ledoux, Ty Nagamatsu, Sherri Giger, Tim Berrier, and Dale Ratliff of the University of Denver, Sturm College of Law.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 14,708 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

*/s/ Deepak Gupta*

November 25, 2014                    Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2014, I electronically filed the foregoing Reply Brief for Defendants-Appellants Steven Donziger, The Law Offices of Steven Donziger, and Donziger & Associates PLLC with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta